I.A.M. NATIONAL PENSION FUND, PLAN A, A BENEFITS, and Eugene Glover and Lester F. Gettel Jr., Co-Chairman of the Board of Trustees, Plaintiffs,

v.

FRASER SHIPYARDS, INC., Defendant.

Civ. A. No. 86–3492 (RCL).

United States District Court, District of Columbia.

July 28, 1988.

Robert T. Osgood (argued) (Joseph P. Martocci, Jr., with him on the brief), Washington, D.C., for plaintiffs.

Carolyn S. Nestingen (argued), Felhaber, Carson, Fenlon & Vogt, St. Paul, Minn. (William P. Dale, McChesney, Duncan & Dale, Washington, D.C., with her on the brief), for defendant.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This is an action to enforce an arbitrator's award pursuant to section 4221 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1401(b)(2) and (3). The Court agrees with both parties that summary judgment is appropriate, and a judgment upholding the arbitrator's award will be entered for plaintiffs.

### Factual and Procedural Background

Plaintiff I.A.M. National Pension Fund, Plan A, A Benefits (the "Fund"), is a collectively bargained multiemployer employee benefit pension plan, as defined by the Multiemployer Pension Plans Amendment Act of 1980, 29 U.S.C. §§ 1002(2), (37), 1301(a)(3). Defendant Fraser Shipyards, Inc. ("Fraser") is a Wisconsin corporation which employs workers represented by several different unions. Up until July 31, 1982, Fraser had two concurrent contracts with the International Association of Machinists and Aerospace Workers, AFL–CIO ("Union" or "I.A.M."). One of these contracts covered union employees at the machine shop of Fraser's shipyard; the other covered union employees at Northern Engineering Works, a separate division of Fraser located about a half mile from the shipyard. Both contracts were collective bargaining agreements requiring the company to make pension contributions to the Fund.

The last of a series of contracts covering union machinists at the shipyard expired after a thirteen month extension on July 31, 1982. Meetings between Fraser and the union were held on July 20, 1982, and

August 4, 1982. At the second of these meetings, Fraser informed the union that due to declining business, it would close the shipyard machine shop on September 1, 1982. A letter dated August 5, 1982, confirmed that "[t]he company does plan to permanently close its machine shop for economic reasons. Closure will take place by September 1, 1982." On September 1, 1982, Fraser did close the shipyard's machine shop. Fraser made no contributions to the Fund on behalf of the shipyard I.A.M. machinists after July 31, 1982, although it continued to make payments covering the union workers at its Northern Engineering Works facility.

In response to a notice of delinquency from the Fund, Fraser served notice by letter dated January 26, 1983, that "[t]he Company discontinued its Machinists Bargaining Unit in September of 1982 and has not had any machinists employed since that time. This is the reason they are no longer making contributions to the Fund." The Fund thereafter assessed withdrawal liability in accordance with ERISA section 4203(a), 29 U.S.C. § 1383, assuming that the closing of the shipyard machine shop constituted a complete withdrawal. Following Fraser's request for a review, the Fund reversed its assessment and refunded previous payments. After requesting information from the company and receiving what it considered to be less than satisfactory responses, the Fund assessed partial withdrawal liability in the amount of $70,-550. *See* ERISA sec. 4205, 29 U.S.C. § 1385. Upon Fraser's request, the Fund reviewed and confirmed its assessment. Fraser then timely requested arbitration.

The arbitration hearing was held on September 25, 1986, in front of E. Frank Cornelius, who issued an opinion on November 28, 1986. The arbitrator's opinion dealt extensively with the standard of review of a withdrawal liability determination, *see* ERISA sec. 4221(a)(3), 29 U.S.C. § 1401(a)(3), and the constitutional issues posed by the statutory presumption of correctness of that determination by a plan sponsor. *Id.* The arbitrator upheld the Fund's liability determination, and in accordance with his constitutional concerns, added *de novo* findings supporting the Fund's decision.

This Court's standard of review of the arbitrator's decision is set forth in ERISA section 4221(c), 29 U.S.C. § 1401(c):

> In any proceeding under subsection (b) of this section, there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct.

Defendant argues that with respect to the arbitrator's conclusions of law, the Court should conduct a de novo review, a contention with which plaintiffs take some issue. The parties diverge as well in their characterizations of the arbitrator's findings as factual, legal, or mixed. After a review of the entire record, it is clear that under any standard, the arbitrator's decision was correct.

### Basis for Partial Withdrawal Liability

One of the issues before the arbitrator was the basis for the Fund's determination of partial withdrawal liability. In its Notice of Arbitration, Fraser had framed the issue this way:

> Clearly, the dispute centers around the year in which the partial withdrawal of the Employer occurred and the reason for the partial withdrawal. If the withdrawal was by reason of a 70% contribution decline, it occurred in 1983. If the withdrawal occurred by reason of ERISA Sec. 4205(b)[2], the withdrawal occurred in 1982 and the assessment by the Pension Fund is correct.

Opinion of the Arbitrator (hereinafter "Op.") at 9.

It is undisputed, however, that the company had consistently been informed by the Fund that partial withdrawal liability was not being imposed on the basis of ERISA section 4205(a)(1), 29 U.S.C. § 1385(a)(1), which mandates partial withdrawal when there is a 70% contribution decline. Rather, the determination of partial withdrawal was based upon sections 4205(a)(2) and (b)(2)(A), which define a partial cessation of

the employer's contribution obligation. Subparagraph (b)(2)(A) reads in full:

> There is a partial cessation of the employer's contribution obligation for the plan year if, during the year—
>
> (i) the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required or transfers such work to another location, or
>
> (ii) an employer permanently ceases to have an obligation to contribute under the plan with respect to work performed at one or more but fewer than all of its facilities, but continues to perform work at the facility of the type for which the obligation to contribute ceased.

ERISA sec. 4205(b)(2)(A), 29 U.S.C. § 1385(b)(2)(A).

The evidence adduced at the arbitration hearing indicates that Fraser's closing of the shipyard machine shop falls within these provisions. When the machine ship was closed, Fraser permanently ceased to have an obligation to contribute under the collective bargaining agreement covering I.A.M. machinists at the shipyard, while retaining its obligation to contribute under the agreement for the Northern Engineering facility. Fraser's president testified that the type of work done by I.A.M. machinists was subsequently performed at the shipyard by the boilermakers and machinists from Northern Engineering Works. Thus, the Fund's determination that the company was subject to partial withdrawal liability under sections (a)(2) and (b)(2)(A) certainly appears to have been correct; the arbitrator's refusal to find that decision clearly erroneous or unreasonable is unassailable.[1]

*Application of Labor Dispute Exception*

■ Fraser claims that it is not subject to partial withdrawal liability because a labor dispute existed between Fraser and the union at the time the shipyard machine shop was closed and continued for over two years subsequent to the closing. Section 4218 of ERISA provides:

> Notwithstanding any other provision of this part, an employer shall not be considered to have withdrawn from a plan solely because ... (2) an employer suspends contributions under the plan during a labor dispute involving its employees.

29 U.S.C. § 1398.

Thus, if Fraser suspended its contributions to the plan on behalf of the shipyard machinists *solely* because of a labor dispute, it should not have been assessed partial withdrawal liability during the pendency of that dispute.

Fraser's position is that the closing of the shipyard machine shop was the result of a labor dispute; that the July 20 and August 4 meetings between the company and the union evidence this fact; that "[n]egotiating sessions continued"; and that "Fraser continued to respond to [union] grievances by stating that the contract with the Union had expired, that Fraser was not willing to process grievances as contractual grievances, but that it remained willing to meet and negotiate concerning the decision to close the machine shop and with respect to the effects of subcontracts." Memorandum in Support of Defendant's Motion for Summary Judgment at 3. Fraser attacks the arbitrator's decision for its failure to apply the labor dispute exception of section 4218, claiming that "[t]he arbitrator found that there was a labor dispute between the parties and that the labor dispute continued beyond the time of the closure of the machine shop." *Id.* at 8.

---

**1.** *See* ERISA sec. 4221(a)(3), 29 U.S.C. § 1401(a)(3). Fraser's argument on this question is brief, consisting of a single sentence quoted from Pension Benefit Guaranty Corporation Opinion Letter No. 82–005, dated February 18, 1982. The full text of that letter has not been presented to the Court; thus the context of the quotation and its applicability to these facts is unclear.

This, however, is not an entirely accurate rendition of the arbitrator's findings. Rather, the opinion notes that "[t]he labor dispute which ensued over the closing of the Machine Shop continued late into 1983." Op. at 3. It is clear that the arbitrator did not find that the shipyard shop was closed as a result of a labor dispute. Quite to the contrary, the arbitrator found that to the extent a labor dispute arose, it followed and was the result of Fraser's unilateral decision to close the shipyard machine shop:

> ... the Company made numerous categorical, unequivocal declarations that it closed the Machine Shop permanently for economic reasons, and time indisputably has born out their truth. Indeed, the Company President testified that the Machine Shop would have been closed regardless of any concessions the Union might have offered in an effort to keep it open [Tr 59]. There simply is no evidence in the record to support the contention that the Company suspended contributions to the Fund *"solely* because" of a labor dispute. Rather, the Company permanently closed the Machine Shop and its closing percipitated a lengthy labor dispute.

Op. at 34 (sic).[2]

Fraser correctly points out that the term "labor dispute" should not be narrowly interpreted, but should instead be defined for purposes of ERISA as it is in the National Labor Relations Act, 29 U.S.C. § 152(9). That definition, which has been adopted by numerous courts, identifies a labor dispute as

> Any controversy concerning terms, tenure, or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee.

*See, e.g., T.I.M.E.–DC, Inc. v. Western Teamsters Pension Fund,* 7 Employee Benefits Cas. (BNA) 2124, 2132 (N.D.Cal. 1986); *T.I.M.E.–DC, Inc. v. I.A.M. National Pension Fund,* 597 F.Supp. 256, 262–63 (D.D.C.1984). There is no indication in the arbitrator's decision, however, that he applied a more restrictive definition of labor dispute. Rather, he simply made a factual determination that there was no labor dispute involved in Fraser's cessation of contributions for the shipyard machinists. This finding is amply supported by the record.

Fraser's letter to the union on August 4, 1982, stated that the shop would be closed for economic reasons. It made no mention of a labor dispute. The company wrote to the Fund on January 26, 1983, to explain why contributions were no longer being made. That letter made no mention of a labor dispute, nor did it assert any circumstances suggesting an exemption for such a dispute under section 4218. Fraser's president testified at the arbitration hearing that regardless of what proposals the union made, the machine shop at the shipyard would have been closed. Arbitration Transcript at 59. Perhaps most significant, Fraser never even raised the issue of the labor dispute exception until August 2, 1985, after the parties had executed the submission agreement for arbitration. Op. at 34. The Court is constrained to agree with the arbitrator that "[t]he Company's defense based on ERISA section 4218(2) seems something of an afterthought." *Id.*[3]

---

**2.** In addition, Fraser's characterization of negotiating sessions which continued into 1983 was stated this way by the arbitrator: "Following the announcement of the Machine Shop's closing, the Company and the Union met only twice, once on October 12, 1982 ... and for the last time on January 13, 1983." Op. at 3. The Court also has no evidence to substantiate Fraser's claim that it continued to express its willingness to discuss the closing of the machine shop; the letters supplied to the Court as responses to grievance reports all consist of terse form letters referencing a standing company answer.

**3.** The arbitrator noted that all of the cases which might support Fraser's position involved employers who early and consistently urged application of the labor dispute exception. Op. at 34; *see T.I.M.E.—DC, Inc. v. I.A.M. National Pension Fund,* 597 F.Supp. 256 (D.D.C.1984); *Sunstar Foods, Inc. v. United Food/Commercial Workers Pension Fund,* 5 Employee Benefits Cas. (BNA) 1349 (D.Minn.1984).

In addition to the factual findings recited above, the arbitrator noted the passage of 28 months between the closing of the machine shop and the Fund's assessment of withdrawal liability, and the four years to the date of the arbitration hearing, in rejecting Fraser's argument that a labor dispute was pending. The arbitrator cited *Robbins v. McNicholas Transportation Co.*, 6 Employee Benefits Cas. (BNA) 1777 (N.D.Ill.1985), for the proposition that "(t)he purpose of 29 U.S.C. Sec. 1398 was to permit an employer to suspend *temporarily* its contributions during a labor dispute ... Congress did not intend to require that a cessation last forever in order to be permanent." *Id.* at 1779.

As defense counsel correctly pointed out at oral argument, *McNicholas* has been vacated and remanded. *Robbins v. McNicholas Transportation Co.*, 819 F.2d 682 (7th Cir.1987). While focusing primarily upon the propriety of ordering interim payments, the court of appeals also disputed the district judge's conclusion that a lack of negotiations allowed him to find a permanent cessation where the record indicated a continuing deadlock between labor and management. *Id.* at 686. The Seventh Circuit did not, however, question the premise that section 1398 (ERISA § 4218) is intended to permit only temporary suspensions of required contributions.

As the court noted in *I.A.M. National Pension Fund v. Schulze Tool and Die Co.*, 564 F.Supp. 1285, 1295 (N.D.Cal.1983), section 1398 "by its terms applies only to a suspension—a temporary interruption—because of a labor dispute; it is evidently intended to prevent the risk of withdrawal liability from influencing labor-management relations when the employer has no intention of permanently withdrawing from the plan." *See also Loomis Armored, Inc. and Central States Pension Fund*, 8 Employee Benefits Cas. (BNA) 1899, 1909 (1987) (Tilove, Arb.) (purpose of § 4218(2) is to avoid having withdrawal liability become weapon in labor dispute); *Garland Coal Co. and UMW 1950 and 1974 Pension Trusts*, 7 Employee Benefits Cas. (BNA) 1771, 1778–79 (1986) (Dreyer, Arb.). This reading of the statute is supported by the legislative history of the amendment that embodied the labor dispute section. Representative Thompson explained the intent of the provision this way:

A temporary suspension of contributions during a strike or lockout would not be a permanent cessation of an obligation to contribute within the meaning of [sec. 4218]. However, consistent with the purposes of the bill, if the facts and circumstances of a particular situation indicate that contributions have ceased permanently—for example, all employees covered under the plan have been permanently replaced or the facility has been closed—the fact that the cessation of any contribution obligation was precipitated by a labor dispute does not mean that no withdrawal has taken place.

126 Cong.Rec. H23038 (daily ed. August 25, 1980) (statement of Rep. Thompson).

Thus, although *McNicholas* is not the best authority for the proposition, the arbitrator's consideration of the extensive passage of time without any indication of a labor dispute was correct. This case is clearly distinguishable from *McNicholas;* no deadlock continues here because none existed at the time the machine shop was closed.

*Effective Date of Withdrawal*

Having agreed with the arbitrator that the Fund properly assessed partial withdrawal liability and that the labor dispute exception is inapplicable, the Court upholds the arbitrator's determination that Fraser's liability accrued in 1982. Unfortunately, there is nothing in the record to indicate the precise date utilized by the Fund in its calculation of the amount of that liability. Section 4205(b)(2)(A) of ERISA, 29 U.S.C. § 1385(b)(2)(A), directs that partial withdrawal occurs when the employer permanently ceases to have an obligation to make contributions. Apparently, the Fund would have been correct in calculating Fraser's liability either from September 1, 1982, the date on which the machine shop was closed, or from July 31, 1982, the date that the last collective bargaining agreement between the company and I.A.M. expired (and the

date that Fraser ceased making contributions on behalf of the shipyard machinists).

■ Whichever date was chosen for the onset of withdrawal liability, however, Fraser would be liable from that date *even if* the labor dispute exception had applied to this case. Defendant's arguments notwithstanding, the better interpretation of §§ 4205 and 4218 is that where a legitimate labor dispute has ended without a resumption of contributions, the date of withdrawal relates back to the date of initial cessation. *See E.A. Nord Co. and Trustees, Western Council, LPIW–TOC Pension Fund,* 8 Employee Benefits Cas. (BNA) 2171, 2177 (Axon, Arb.) (1987) *Loomis Armored, Inc. and Central States Pension Fund, supra,* 8 Employee Benefits Cas. (BNA) 1899, 1909; *Marvin Hayes Lines, Inc. and Central States Pension Fund,* 8 Employee Benefits Cas. (BNA) 1834, 1844 (Weckstein, Arb.) (1987); *Garland Coal Co. and UMW 1950 AND 1974 Pension Trusts, supra,* 7 Employee Benefits Cas. (BNA) 1771, 1780. In this context, the Court gives weight, as did the arbitration rulings cited above, to an Advisory Opinion Letter of the Pension Benefit Guaranty Corporation (PBGC) dated February 28, 1986 and released March 14, 1986. The full text of the letter is reproduced in *Marvin Hayes Lines, Inc., supra,* 8 Employee Benefits Cas. (BNA) at 1842–43; relevant portions are quoted here:

> [I]t is our opinion that the date of the withdrawal is the date on which the employer ceased to have an obligation to contribute under the plan or ceased all covered operations under the plan, even if, as is the usual case, that date is not the date on which section 4218(2) of ERISA ceased to apply to the employer
> . . .
> Section 4218(2) protects employers from unwarranted or premature assessments of withdrawal liability during a labor dispute. Without section 4218(2), withdrawal liability might be assessed at the outset of a labor dispute even though at that point it is generally not clear whether the cessation of the obligation to contribute

or of covered operations is permanent or temporary.

> If the dispute ends with the employer's obligation to contribute eliminated, it is clear that the cessation was permanent and that a withdrawal has occurred. (Moreover, if the employer has permanently ceased covered operations or ceased to have an obligation to contribute, rather than simply suspend contributions during a labor dispute, a withdrawal has occurred regardless of whether a labor dispute continues to exist.)

> By its terms . . . section 4218(2) addresses only the issue of whether an employer "shall be considered to have withdrawn from a plan." Section 4218(2) does not attempt to define the date of a withdrawal that has been determined to have occurred.

> Once it has been determined that a complete withdrawal has occurred, the date of the complete withdrawal is governed by section 4203(3) of ERISA, which provides:

> "For purposes of this part, the date of a complete withdrawal is the date of the cessation of the obligation to contribute or the date of the cessation of covered operations."

> Thus, in your case, if the date of the strike was the date on which covered operations or the obligation to contribute ceased, that date is used for purposes of calculating withdrawal liability.

> This conclusion is consistent with basic features of ERISA's formulas for withdrawal liability, under several of which the amount of the employer's liability is based in part on the level of its recent contributions. In particular, under the method of section 4211(c)(3) of ERISA, 29 U.S.C. § 1391(c)(3), if the date of withdrawal were the date on which the section 4218(2) exemption ceased to apply to the employer, an employer that suspends contributions at the beginning of a labor dispute would frequently see its withdrawal liability reduced by the passage of time, thus gradually transferring its share of the plan's unfunded obligations to remaining and newly entering employers. (Indeed, if such an employer were

determined to have withdrawn six years after the initial suspension of contributions it would escape withdrawal liability entirely.) Such a possibility exists, to a lesser extent, with other withdrawal liability formulas. Our conclusion prevents such a gradual transfer by assessing the employer the same withdrawal liability that it would have been assessed if the cessation of its obligation to contribute or of its covered operations had immediately been identified as permanent.

Although the PBGC opinion letter specifically addresses the question of the effective date for a complete withdrawal, the reasoning therein clearly applies with equal force to a determination of partial withdrawal where the employer has permanently ceased covered operations or ceased to have an obligation to contribute. Indeed, the facts of this case bear witness to the soundness of the PBGC rationale. If an employer could unilaterally close a facility, thus precipitating a "labor dispute" over the closing despite having no intention of reopening that facility, and be exempted from ever making required payments covering the period up to and until the NLRB rules on the union's protest, the statutory purpose of withdrawal liability would be easily frustrated.

### The Fund's Duty to Investigate

Fraser argues that the Fund failed to adequately investigate the possibility that the labor dispute exception of section 4218(2) applied to this case, and its determination was thus clearly erroneous or unreasonable. Further, the company argues that the arbitrator's failure to make such a finding is, by a clear preponderance of the evidence, incorrect. Fraser's argument that the fund failed to satisfy its duty to independently investigate the facts underlying its conclusion of withdrawal, has no force, however, since the arbitrator specifi-

cally made his own de novo finding that the labor dispute exception did not apply. Even if the Fund's assessment failed to take into account arguably relevant factors,[4] the arbitrator did not simply review that determination under a "clearly erroneous" standard. He reviewed the record and the arguments and concluded, as has this Court, that Fraser's attempt to employ the labor dispute exception to circumvent its partial withdrawal liability must fail.

JUDGMENT will be entered for plaintiffs.

---

4. ERISA section 4219(b)(2)(A), 29 U.S.C. § 1399(b)(2)(A), allows an employer to request a review of a plan sponsor's determination and furnish additional documents no later than 90 days after receiving notice of a liability assessment. The Fund's initial assessment was sent to Fraser on May 22, 1984. The revised assessment was sent to the company on January 22, 1985. During this time period, the Fund requested and received information from Fraser regarding the cessation of payments; at no time prior to August 2, 1985, did the company mention any labor dispute. At that point, the Fund refused to reconsider its assessment.